MDL 1446

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

JUL 1 0 2002

FILED
CLERK'S OFFICE

## BEFORE THE JUDICIAL PANEL
## ON MULTIDISTRICT LITIGATION

| | |
|---|---|
| IN RE ENRON CORP. SECURITIES, DERIVATIVE & "ERISA" LITIGATION | MDL DOCKET NO. 1446 |

**DEFENDANTS CREDIT SUISSE FIRST BOSTON, CIBC WORLD MARKETS CORP., PAINE WEBBER, INC., SALOMON SMITH BARNEY, INC., DONALDSON, LUFKIN & JENRETTE SECURITIES CORP., DLJDIRECT, INC., CHASE SECURITIES INC. AND PETER GRAUER'S MOTION TO VACATE CONDITIONAL TRANSFER ORDERS CTO-1 AND CTO-3 AS THEY RELATE TO THE NEWPOWER LITIGATION**

Pursuant to Rule 7.4(d) of the Rules of Procedure of the Judicial Panel on Multidistrict Litigation, defendants Credit Suisse First Boston,[1] CIBC World Markets Corp., Paine Webber, Inc., Salomon Smith Barney, Inc., Donaldson, Lufkin & Jenrette Securities Corp., DLJDirect,

---

[1] Some of the individual complaints that have been consolidated in In re NewPower Securities Litigation, No. 02-1550 (S.D.N.Y.) name Credit Suisse First Boston Corp., and some name Credit Suisse First Boston, Inc. Presumably the consolidated complaint when it is filed will identify which entity is the intended defendant.

**OFFICIAL FILE COPY** IMAGED JUL 12 '02

Inc., Chase Securities, Inc. ("the Underwriter Defendants")[2] and Peter Grauer hereby move to vacate the Conditional Transfer Orders CTO-1 and CTO-3, entered in this matter on May 24, 2002 and June 12, 2002, as they relate to nine actions that have been previously consolidated in the action entitled In re NewPower Securities Litigation, No. 02-1550 (CLB) (S.D.N.Y.) ("NewPower Litigation")[3] and aver through counsel as follows:

---

[2] The Underwriter Defendants are sued in their own right and as alleged representatives of a purported defendant class of 24 underwriters. See, e.g., Pfau v. Lockhart, No. 02-1550 (S.D.N.Y.), Complaint ¶ 41. The Court has not yet addressed the issue of whether a defendant class should be certified.

[3] There are a total of eleven cases pertaining to NewPower that have been filed in the Southern District of New York and that have been consolidated before Judge Brieant as In re NewPower Securities Litigation, No. 02-1550 (CLB) (S.D.N.Y.). See Civil Case Discovery Plan and Order, Pfau v. Lockhart, No. 02-1550 (S.D.N.Y. Apr. 25, 2002). CTO-1 identifies five of the cases pertaining to NewPower: Pfau v. Lockhart, No. 02-1550 (S.D.N.Y. filed Feb. 27, 2002), Miller v. Lockhart, No. 02-1876 (S.D.N.Y. filed Mar. 7, 2002), Weber v. Lockhart, No. 02-1977 (S.D.N.Y. filed Mar. 11, 2002), Halpern v. Lockhart, No. 02-2268 (S.D.N.Y. filed Mar. 21, 2002), and Parker v. NewPower Holdings, Inc., No. 02-2360 (S.D.N.Y. filed Mar. 26, 2002). CTO-3 identifies four more cases pertaining to NewPower: O'Donoghue v. Lockhart, No. 02-2701 (S.D.N.Y. filed Apr. 8, 2002), Amon v. Lockhart, No. 02-2798 (S.D.N.Y. filed Apr. 11, 2002), Haratz v. Lockhart, No. 02-2829 (S.D.N.Y. filed Apr. 12, 2002), and Tag v. Lockhart, No. 02-3025 (S.D.N.Y. filed Apr. 19, 2002). The other two cases that have been consolidated in the NewPower Litigation but are not identified in CTO-1 or CTO-3 are Solomon v. Lockhart, No. 02-2701 (S.D.N.Y. filed March 1, 2002) and Patel v. NewPower Holdings, Inc., No. 02-3170 (S.D.N.Y. filed Apr. 24, 2002). This Motion is intended to address all eleven cases that are now consolidated as In re NewPower Securities Litigation. See attached Schedule A.

1.   The NewPower Litigation does not fall within the parameters of the Panel's original transfer order in MDL No. 1446, consolidating claims by Enron's "securities holders seeking relief under the federal securities laws, shareholders suing derivatively on behalf of Enron, or participants in Enron retirement savings plans suing for violations of the Employee Retirement Income Security Act of 1974" because of shared factual questions relating to "the financial collapse of Enron Corp.".  See Transfer Order at 1, In re Enron Corp. Securities, Derivative & "ERISA" Litig., MDL Docket No. 1446 (J.P.M.L. April 16, 2002) (the "Enron MDL").

2.   The Enron MDL is designed to address the claims of Enron shareholders and participants in the Enron retirement savings plan, directed at the adequacy of Enron's SEC filings and other Enron disclosures -- not the claims of NewPower shareholders challenging the adequacy of the NewPower Prospectus and Registration Statement issued in connection with NewPower's initial public offering ("IPO") on October 5, 2000.  Although NewPower was spun out of Enron as part of the NewPower IPO, discovery in the NewPower Litigation must focus on what NewPower said in its Prospectus and Registration Statement (and subsequent SEC filings), and the facts regarding NewPower's plans and performance.

3.    To the extent there is any overlap between
discovery in the NewPower Litigation and in the Enron MDL
Litigation, duplication may be avoided by informal
coordination, making discovery taken in the Enron MDL
available in the NewPower Litigation.  It would be far more
efficient, for the courts and the parties, to coordinate the
limited overlapping aspects of these litigations without
transferring the NewPower Litigation to Houston as
contemplated by CTO-1 and CTO-3.

4.    For these reasons, on June 10, 2002, the
Underwriter Defendants and Defendant Grauer timely filed a
Notice of Opposition to CTO-1 and on June 26, 2002 the
Underwriter Defendants and Defendant Grauer timely filed a
Notice of Opposition to CTO-3.

5.    Defendants NewPower Holdings, Inc., H. Eugene
Lockhart, William I. Jacobs and Stephen Nolan have also
filed Notices of Opposition to both CTO-1 and CTO-3, and so
have all of the plaintiffs in the consolidated NewPower
Litigation.

6.    The Underwriter Defendants and Defendant
Grauer now submit this Motion to Vacate Conditional Transfer
Orders CTO-1 and CTO-3 in accordance with Rule 7.4(d) of the
Rules of this Panel.  In further support of the Motion, the
Underwriter Defendants and Defendant Grauer incorporate by
reference the accompanying Brief in Support of Their Motion

to Vacate Conditional Transfer Orders CTO-1 and CTO-3, filed concurrently herewith.

WHEREFORE Credit Suisse First Boston, CIBC World Markets Corp., Paine Webber, Inc., Salomon Smith Barney, Inc., Donaldson, Lufkin & Jenrette Securities Corp., DLJDirect, Inc., Chase Securities, Inc., and Peter Grauer respectfully ask that CTO-1 and CTO-3 be vacated as they relate to the consolidated NewPower Litigation.

July 10, 2002

Respectfully submitted,

Richard W. Clary
Julie A. North
CRAVATH, SWAINE & MOORE
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019
(212) 474-1000
Fax: (212) 474-3700

Attorneys for Defendants
CREDIT SUISSE FIRST BOSTON
CIBC WORLD MARKETS CORP.
PAINE WEBBER, INC.
SALOMON SMITH BARNEY, INC.
DONALDSON, LUFKIN & JENRETTE
    SECURITIES CORP.
DLJDIRECT, INC.
CHASE SECURITIES, INC. and
PETER GRAUER

## SCHEDULE A

### CTO-1 (May 24, 2002)

1.  Peter A. Pfau, Joseph Harre, and James Casey Lippmeier
    v. H. Eugene Lockhart, Kenneth L. Lay, Lou L. Pai,
    James V. Derrick, Jr., Richard A. Causey, William I.
    Jacobs, Peter Grauer, Linda G. Alvarado, Ray J. Groves,
    Credit Suisse First Boston, Inc., Donaldson, Lufkin &
    Jenrette Securities Corp., Chase Securities, Inc., CIBC
    World Markets Corp., Painewebber, Inc., Salomon Smith
    Barney, Inc., DLJDirect, Inc., and Newpower Holdings,
    Inc., No. 02-1550 (S.D.N.Y. filed Feb. 27, 2002)

2.  Dorina Miller v. H. Eugene Lockhart, Kenneth L. Lay,
    Lou L. Pai, James V. Derrick, Jr., Richard A. Causey,
    William I. Jacobs, Peter Grauer, Linda G. Alvarado, Ray
    J. Groves, Credit Suisse First Boston, Inc., Donaldson,
    Lufkin & Jenrette Securities Corp., Chase Securities,
    Inc., CIBC World Markets Corp., Painewebber, Inc.,
    Salomon Smith Barney, Inc., DLJDirect, Inc., and
    Newpower Holdings, Inc., No. 02-1876 (S.D.N.Y. filed
    Mar. 7, 2002)

3.  Lisa A. Weber v. H. Eugene Lockhart, Kenneth L. Lay,
    Lou L. Pai, James V. Derrick, Jr., Richard A. Causey,
    William I. Jacobs, Peter Grauer, Linda G. Alvarado, Ray
    J. Groves, Credit Suisse First Boston, Inc., Donaldson,
    Lufkin & Jenrette Securities Corp., Chase Securities,
    Inc., CIBC World Markets Corp., Painewebber, Inc.,
    Salomon Smith Barney, Inc., DLJDirect, Inc., and
    Newpower Holdings, Inc., No. 02-1977 (S.D.N.Y. filed
    Mar. 11, 2002)

4.  Jack A. Halpern, individually and On Behalf of All
    Others Similarly Situated, v. H. Eugene Lockhart,
    Kenneth L. Lay, Lou L. Pai, James V. Derrick, Jr.,
    Richard A. Causey, William I. Jacobs, Peter Grauer,
    Linda G. Alvarado, Ray J. Groves, Credit Suisse First
    Boston, Inc., Donaldson, Lufkin & Jenrette Securities
    Corp., Chase Securities, Inc., CIBC World Markets
    Corp., Painewebber, Inc., Salomon Smith Barney, Inc.,
    DLJDirect, Inc., and Newpower Holdings, Inc., No. 02-
    2268 (S.D.N.Y. filed Mar. 21, 2002)

5.  Victor Parker, Trustee v. Newpower Holdings, Inc., H.
    Eugene Lockhart, Lou L. Pai, William I. Jacobs, Stephen
    Nolan,  Kenneth L. Lay, James V. Derrick, Richard A.
    Causey, Credit Suisse First Boston Corp., Donaldson,
    Lufkin & Jenrette Securities Corp., Chase Securities,

Inc., CIBC World Markets Corp., Painewebber, Inc., Salomon Smith Barney, Inc., and DLJDirect, Inc., No. 02-2360 (S.D.N.Y. filed Mar. 26, 2002)

## CTO-3 (June 12, 2002)

6. Patricia O'Donoghue, Virginia G. Miller, Patricia M. Miller, Daniel P. Miller, Daniel K. Miller and Kathleen Miller v. H. Eugene Lockhart, Kenneth L. Lay, Lou L. Pai, James V. Derrick, Jr., Richard A. Causey, William I. Jacobs, Peter Grauer, Linda G. Alvarado, Ray J. Groves, Credit Suisse First Boston, Inc., Donaldson, Lufkin & Jenrette Securities Corp., Chase Securities, Inc., CIBC World Markets Corp., Painewebber, Inc., Salomon Smith Barney, Inc., DLJDirect, Inc., and Newpower Holdings, Inc., No. 02-2701 (S.D.N.Y. filed Apr. 8, 2002)

7. Christophe J. Amon v. H. Eugene Lockhart, Kenneth L. Lay, Lou L. Pai, James V. Derrick, Jr., Richard A. Causey, William I. Jacobs, Peter Grauer, Linda G. Alvarado, Ray J. Groves, Credit Suisse First Boston, Inc., Donaldson, Lufkin & Jenrette Securities Corp., Chase Securities, Inc., CIBC World Markets Corp., Painewebber, Inc., Salomon Smith Barney, Inc., DLJDirect, Inc., and Newpower Holdings, Inc., No. 02-2798 (S.D.N.Y. filed Apr. 11, 2002)

8. Rosalyn M. Haratz, on Behalf of Herself and All Others Similarly Situated v. H. Eugene Lockhart, Kenneth L. Lay, Lou L. Pai, James V. Derrick, Jr., Richard A. Causey, William I. Jacobs, Peter Grauer, Linda G. Alvarado, Ray J. Groves, Credit Suisse First Boston, Inc., Donaldson, Lufkin & Jenrette Securities Corp., Chase Securities, Inc., CIBC World Markets Corp., Painewebber, Inc., Salomon Smith Barney, Inc., DLJDirect, Inc., and Newpower Holdings, Inc., No. 02-2829 (S.D.N.Y. filed Apr. 12, 2002)

9. Paul E. Tag, on Behalf of Himself and All Others Similarly Situated v. H. Eugene Lockhart, Kenneth L. Lay, Lou L. Pai, James V. Derrick, Jr., Richard A. Causey, William I. Jacobs, Peter Grauer, Linda G. Alvarado, Ray J. Groves, Credit Suisse First Boston, Inc., Donaldson, Lufkin & Jenrette Securities Corp., Chase Securities, Inc., CIBC World Markets Corp., Painewebber, Inc., Salomon Smith Barney, Inc., DLJDirect, Inc., and Newpower Holdings, Inc., No. 02-3025 (S.D.N.Y. filed Apr. 19, 2002)

### Rule 7.5(e) Notice (June 17, 2002)

10.  Manisha Patel v. Newpower Holdings, Inc., Lou L. Pai,
     H. Eugene Lockhart, William I. Jacobs, Kenneth L. Lay,
     James V. Derrick, Jr., Richard A. Causey, Peter Grauer,
     Linda G. Alvarado, Ray J. Groves, Credit Suisse First
     Boston Corp., Donaldson, Lufkin & Jenrette Securities
     Corp., Chase Securities, Inc., CIBC World Markets
     Corp., Painewebber, Inc., Salomon Smith Barney, Inc.,
     DLJDirect, Inc., No. 02-3170 (S.D.N.Y. filed Apr. 24,
     2002)

### Rule 7.5(e) Notice Docketed (July 3, 2002)

11.  Irvin Solomon v. H. Eugene Lockhart, Kenneth L. Lay,
     Lou L. Pai, James V. Derrick, Jr., Richard A. Causey,
     William I. Jacobs, Peter Grauer, Linda G. Alvarado, Ray
     J. Groves, Credit Suisse First Boston, Inc., Donaldson,
     Lufkin & Jenrette Securities Corp., Chase Securities,
     Inc., CIBC World Markets Corp., Painewebber, Inc.,
     Salomon Smith Barney, Inc., DLJDirect, Inc., and
     Newpower Holdings, Inc., No. 02-1763 (S.D.N.Y. filed
     Mar. 1, 2002)

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

JUL 1 0 2002

FILED
CLERK'S OFFICE

**BEFORE THE JUDICIAL PANEL
ON MULTIDISTRICT LITIGATION**

| | |
|---|---|
| IN RE ENRON CORP. SECURITIES, DERIVATIVE, & "ERISA" LITIGATION | MDL DOCKET NO. 1446 |

**DEFENDANTS CREDIT SUISSE FIRST BOSTON, CIBC WORLD MARKETS
CORP., PAINE WEBBER, INC., SALOMON SMITH BARNEY, INC.,
DONALDSON, LUFKIN & JENRETTE SECURITIES CORP.,
DLJDIRECT, INC., CHASE SECURITIES INC. AND PETER GRAUER'S
BRIEF IN SUPPORT OF THEIR MOTION TO VACATE
CONDITIONAL TRANSFER ORDERS CTO-1 AND CTO-3 AS THEY RELATE
TO THE NEWPOWER LITIGATION**

RECEIVED
CLERK'S OFFICE
2002 JUL 10 PD 3: 15

Defendants Credit Suisse First Boston,[1] CIBC World

Markets Corp., Paine Webber, Inc., Salomon Smith Barney,

Inc., Donaldson, Lufkin & Jenrette Securities Corp.,

DLJDirect, Inc., Chase Securities, Inc. (collectively the

"Underwriter Defendants")[2] and Defendant Peter Grauer

respectfully move to vacate the Panel's Conditional Transfer

Orders dated May 24, 2002 ("CTO-1")[3] and June 12, 2002

---

[1] Some of the individual complaints that have been consolidated in In re NewPower Securities Litigation, No. 02-1550 (CLB) (S.D.N.Y.) ("NewPower Litigation") name Credit Suisse First Boston Corp., and some name Credit Suisse First Boston, Inc. Presumably the consolidated complaint, when it is filed, will identify which entity is the intended defendant.

[2] The Underwriter Defendants are sued in their own right and as alleged representatives of a purported defendant class of 24 underwriters. See, e.g., Pfau v. Lockhart, No. 02-1550 (S.D.N.Y.), Complaint ¶ 41. (A copy of the Pfau complaint, as the first filed of the NewPower cases, is attached as Exhibit A.) The Court has not yet addressed the issue of whether a defendant class should be certified.

[3] There are a total of eleven cases pertaining to NewPower that have been filed in the Southern District of New York and that have been consolidated before Judge Brieant as In re NewPower Securities Litigation, No. 02-1550 (CLB) (S.D.N.Y.). See Civil Case Discovery Plan and Order, Pfau v. Lockhart, No. 02-1550 (S.D.N.Y. Apr. 25, 2002), attached Exhibit B. CTO-1 identifies five of the cases pertaining to NewPower: Pfau v. Lockhart, No. 02-1550 (S.D.N.Y. filed Feb. 27, 2002), Miller v. Lockhart, No. 02-1876 (S.D.N.Y. filed Mar. 7, 2002), Weber v. Lockhart, No. 02-1977 (S.D.N.Y. filed Mar. 11, 2002), Halpern v. Lockhart, No. 02-2268 (S.D.N.Y. filed Mar. 21, 2002), and Parker v. NewPower Holdings, Inc., No. 02-2360 (S.D.N.Y. filed Mar. 26, 2002). CTO-3 identifies four more cases pertaining to NewPower: O'Donoghue v. Lockhart, No. 02-2701 (S.D.N.Y. filed Apr. 8, 2002), Amon v. Lockhart, No. 02-2798 (S.D.N.Y. filed Apr. 11, 2002), Haratz v. Lockhart, No. 02-2829 (S.D.N.Y. filed Apr. 12, 2002), and Tag v. Lockhart, No. 02-3025 (S.D.N.Y. filed Apr. 19, 2002). The other two cases that have been consolidated in the NewPower Litigation but

("CTO-3") as they relate to the <u>NewPower</u> Litigation, and submit this brief in support thereof.

Procedural History

On April 16, 2002, this Panel transferred over 50 litigations relating to Enron Corp. to the Southern District of Texas for coordinated or consolidated pretrial proceedings.  <u>See</u> Transfer Order, <u>In re Enron Corp. Securities, Derivative & "ERISA" Litig.</u>, MDL Docket No. 1446 (J.P.M.L. Apr. 16, 2002) (the "Enron MDL").  The transfer included claims alleging "negligent and/or fraudulent conduct relating to the financial collapse of Enron Corp.", whether brought by:  (1) Enron "securities holders seeking relief under the federal securities laws", (2) "shareholders suing derivatively on behalf of Enron", or (3) "participants in Enron retirement savings plans suing for violations of the Employee Retirement Income Security Act of 1974".  <u>Id.</u> at 1.

From February 27, 2002, through April 24, 2002, eleven actions related to NewPower Holdings, Inc. ("NewPower"), were filed in the Southern District of New York and assigned to Judge Brieant.  On April 25, 2002,

_____

are not identified in CTO-1 or CTO-3 are <u>Solomon v. Lockhart</u>, No. 02-2701 (S.D.N.Y. filed March 1, 2002) and <u>Patel v. NewPower Holdings, Inc.</u>, No. 02-3170 (S.D.N.Y. filed Apr. 24, 2002).  This Motion is intended to address all eleven cases that are now consolidated as <u>In re NewPower Securities Litigation</u>.  <u>See</u> Schedule A attached to the Motion.

Judge Brieant consolidated these eleven cases into In re
NewPower Securities Litigation. See Civil Case Discovery
Plan and Order, Pfau v. Lockhart, No. 02-1550 (CLB)
(S.D.N.Y. Apr. 25, 2002), attached Exhibit B.  A
consolidated complaint is to be filed shortly.  While the
definitions of the plaintiff class varied somewhat among the
eleven NewPower complaints prior to the consolidation order,
all eleven purport to be on behalf of purchasers of NewPower
common stock on or after the October 5, 2000 initial public
offering ("IPO") by NewPower.  The named defendants are
NewPower, various of its officers and directors, and the
underwriters of NewPower's IPO.

On April 23, 2002, Defendant Kenneth L. Lay filed
a Notice of Potential Tag-Along Actions, notifying the Panel
of five NewPower cases.  See Notice of Potential Tag-Along
Actions, In re Enron Corp. Securities, Derivative, & "ERISA"
Litig., MDL Docket No. 1446 (J.P.M.L. Apr. 23, 2002).  On
May 24, 2002, the Panel conditionally transferred these
cases from the Southern District of New York to the Southern
District of Texas.  See Conditional Transfer Order (CTO-1),
In re Enron Corp. Securities, Derivative & "ERISA" Litig.,
MDL Docket No. 1446 (J.P.M.L. May 24, 2002).  On June 12,
2002, the Panel conditionally transferred four more NewPower
cases.  See Conditional Transfer Order (CTO-3), In re Enron
Corp. Securities, Derivative and "ERISA" Litig., MDL Docket
No. 1446 (J.P.M.L. June 12, 2002).

Because the <u>NewPower</u> Litigation is separate and distinct from the substantive focus of the Enron MDL, the Underwriter Defendants and Defendant Grauer timely filed Notices of Opposition to CTO-1 and CTO-3.  Consistent with Rule 7.4(d) of the Rules of this Panel, the Underwriter Defendants and Defendant Grauer now submit this brief and accompanying motion to vacate CTO-1 and CTO-3 as they relate to the <u>NewPower</u> Litigation.

## <u>Legal Standard</u>

A conditional transfer order is "an administrative device used to expeditiously transfer apparently related cases where there is no opposition to such a transfer".  <u>In re Multidistrict Commodity Credit Corp. Litig.</u>, 319 F. Supp. 533, 534 (J.P.M.L. 1970).  It does not constitute a decision or judgment that transfer is warranted, and instead "is simply an administrative act of the Clerk which can be and will be vacated upon the showing of good cause".  <u>Id.</u>  A subsequent tag-along transfer should not expand the original and intended scope of an MDL order.  <u>See</u> <u>In re Tobacco/Governmental Health Care Costs Litig.</u>, 76 F. Supp. 2d 5, 10 (D.D.C. 1999).

In addition to being within the intended scope of an MDL Order, in order to qualify for transfer as a tag-along action:  (1) a case must pose common questions of fact with an existing MDL action; (2) the convenience of the

4

parties and witnesses must urge the pretrial coordination or consolidation of cases in a single transferee court; and (3) the just and efficient conduct of the litigations must demand the use of centralized proceedings.  See 28 U.S.C. § 1407(a).  "The existence of common questions of fact between actions is . . . . but one condition precedent" under the statute.  In re Drowning Incident at Quality Inn Northeast, 405 F. Supp. 1304, 1306 (J.P.M.L. 1976).  The mere fact that lawsuits bear some general relation with each other does not justify transfer when compelling differences distinguish the nature of the cases.  See In re Petroleum Prods. Antitrust Litig., 476 F. Supp. 455, 455-58 (J.P.M.L. 1979) (vacating a conditional transfer order even though ongoing MDL litigation raised the same general challenges to the "structure and business practices of the petroleum industry on national, state and local levels").

Moreover, when potential tag-along actions would require "unique discovery concerning certain issues . . . that are not involved in the [MDL] actions", the Panel should not transfer the tag-along action.  Id. at 457.  See also In re Westinghouse Elec. Corp. Uranium Contract Litig., 436 F. Supp. 990, 995-96 (J.P.M.L. 1977) (vacating a conditional transfer order because "any common factual issues do not predominate"); In re Motion Picture Licensing Antitrust Litig., 479 F. Supp. 581, 592 (J.P.M.L. 1979) (declining to transfer a tag-along action because its

5

"attendant unique legal and factual nuances" would "add further layers of complexity" to an MDL case).

None of these factors supports a transfer of the <u>NewPower</u> Litigation to the Enron MDL.  Accordingly, the <u>NewPower</u> Litigation should remain in the Southern District of New York for all purposes.

<u>Argument</u>

The Panel should vacate CTO-1 and CTO-3 because: (1) the <u>NewPower</u> Litigation is beyond the scope of this Panel's original MDL order in the Enron Litigation; (2) transferring the <u>NewPower</u> Litigation to the Enron MDL for pretrial purposes would unduly inject new and quite distinct factual issues into the Enron MDL; (3) transfer would unduly burden the parties, witnesses, and attorneys in the <u>NewPower</u> Litigation; and (4) transfer of the <u>NewPower</u> Litigation would hinder the just and efficient conduct of both the Enron MDL and the <u>NewPower</u> Litigation.

I.   THE <u>NEWPOWER</u> LITIGATION IS BEYOND THE SCOPE OF THE ORIGINAL ENRON MDL ORDER.

The Enron MDL was designed to address claims "relating to the financial collapse of <u>Enron Corp.</u>"  <u>See</u> Transfer Order at 1 (emphasis added).  The language of the Transfer Order makes clear that the Panel only contemplated transfer of claims brought by:  (1) "[Enron] securities holders seeking relief under the federal securities laws",

6

(2) "shareholders suing derivatively on behalf of Enron", or
(3) "participants in Enron retirement savings plans suing
for violations of the Employee Retirement Income Security
Act of 1974".  Id.  The NewPower Litigation does not fall
within these categories.

Unlike the cases pending in the Enron MDL, which
are brought by either Enron shareholders or participants in
the Enron retirement savings plan, the NewPower Litigation
is brought "on behalf of all persons who purchased NewPower
common stock."  Pfau v. Lockhart Complaint ¶ 4 (emphasis
added), attached Exhibit A.  Compare Tittle v. Enron Corp.
First Consolidated and Amended Complaint, No. H-01-3913
(S.D. Tex. Apr. 8, 2002) (class action by Enron employees
who participated in the Enron employee savings plan), and
Newby v. Enron Corp. Consolidated Complaint, No. H-01-3624
(S.D. Tex. Apr. 8, 2002) (class action by purchasers of
Enron securities).  (Due to their length, totaling over 800
pages, we have not attached the Newby and Tittle
complaints.)  Not only is the NewPower Litigation not
brought by Enron shareholders or participants in Enron's
employee savings plan, but Enron security holders could not
have brought the NewPower Litigation because they would have
lacked standing to do so.  Rather, the NewPower Litigation
is brought solely by NewPower security holders and does not
fall within the scope of the original Enron MDL order.

7

Because NewPower spun out of Enron and Enron continued to have business relations with NewPower following the NewPower IPO, it is not surprising that the NewPower complaints contain various statements about Enron.  See, e.g., Pfau v. Lockhart Complaint ¶ 12 (stating that "[m]arket concerns as to why NewPower would succeed where others failed were addressed by NewPower [in its Registration Statement] through claims that it was in a better position than its competitors due to its special relationship with Enron, which purportedly (through EES) had the ability to obtain energy for NewPower at reasonable wholesale prices, and to help NewPower 'hedge' against volatility in market prices so that the Company could remain competitive.").  However, allegations such as these do not bring the NewPower Litigation within the scope of the Enron MDL.  The legal and factual issues raised by the NewPower Litigation relate to whether NewPower stock purchasers were misled by actionable misrepresentations by NewPower in its SEC filings.

Because the original MDL order contemplated only the transfer for pretrial purposes of litigation brought by Enron shareholders or participants in the Enron retirement savings plan, the consolidated NewPower Litigation, alleging securities violations by NewPower and brought by NewPower shareholders, simply does not fall within the contemplated scope of the original MDL order.  Accordingly, the Panel

should vacate CTO-1 and CTO-3 as they relate to the <u>NewPower</u>
Litigation.  <u>See</u> <u>In re Tobacco/Governmental Health Care
Costs Litig.</u>, 76 F. Supp. 2d at 10.


II.  THE <u>NEWPOWER</u> LITIGATION IS BASED ON DIFFERENT FACTUAL
     ALLEGATIONS AND INVOLVES DIFFERENT PARTIES THAN THE
     ENRON MDL

        The Enron MDL and the <u>NewPower</u> Litigation are
separate and distinct.  The two litigations involve (1)
different factual and legal allegations and
(2) substantially different parties.  Because of these major
differences, the two cases do not have the requisite factual
overlap necessary for transfer under section 1407, and CTO-1
and CTO-3 should be vacated.  <u>See, e.g.</u>, <u>In re Royal Regency
Sec. Litig.</u>, 1988 U.S. Dist. LEXIS 17035, at *2-3 (J.P.M.L.
1988); <u>In re King Res. Co. Sec. Litig.</u>, 342 F. Supp. 1179,
1184 (J.P.M.L. 1972).

        <u>First</u>, the two cases involve different factual and
legal allegations, directed at different parties, regarding
conduct allegedly occurring at different points in time.
The Enron MDL cases allege liability related to Enron
securities offerings, Enron disclosures, and Enron
accounting practices that span several years.  The claims
are asserted under the federal securities laws, Texas common
law of negligence, Texas state law civil conspiracy claims,
ERISA, RICO, and the Texas Securities Act.  <u>See, e.g.</u>,
<u>Tittle</u> Complaint ¶¶ 738-835; <u>Newby</u> Complaint ¶¶ 992-1030.

In contrast, the consolidated NewPower complaints allege exclusively federal securities law claims related to what NewPower said in its Prospectus and Registration Statement for its IPO and in subsequent SEC filings, and the facts relate to NewPower's plans and performance from October 5, 2000 to essentially the end of 2001.  Thus, the two cases do not have the requisite factual and legal overlap but instead focus on separate and distinct events that will require distinct pretrial proceedings.

Second, the NewPower Litigation involves different parties than the Enron MDL.  To begin, the two litigations are brought by quite different plaintiff classes.[4]  The Enron MDL plaintiff classes purport to include the participants and beneficiaries of Enron's employee stock ownership, savings, and cash balance plans, recipients of "phantom" stock compensation, and purchasers of Enron securities during time periods spanning back to January 1998.  In contrast, the purported NewPower class only includes individuals who purchased NewPower common stock between October 5, 2000, and (at the latest) December 5, 2001.

Furthermore, the defendants in the Enron MDL include Enron; numerous Enron executives, officers, and directors; the Enron employee savings plans as well as their

---

[4] The plaintiff classes have not been certified in either the Enron MDL or the NewPower Litigation.

10

administrators and fiduciaries; Arthur Anderson and various
of its partners, executives and employees; Vinson & Elkins;
Kirkland & Ellis; and ten investment banks. See Newby
Complaint ¶¶ 82-108; Tittle Complaint ¶¶ 44-156.   In
contrast, the NewPower complaints name NewPower and various
of its officers and directors, and seven investment banks as
defendants. See, e.g., Pfau Complaint ¶¶ 31-41.[5]  Overlap
between the defendants in the Enron MDL and the NewPower
Litigation is minimal.  Although Salomon Smith Barney, Inc.,
CIBC, and Credit Suisse First Boston are defendants in both
the Enron MDL and the NewPower Litigation, they are being
sued in the Enron MDL because of their alleged relationships
with Enron, but are being sued in the NewPower Litigation
solely because of their involvement as underwriters in the
October 5, 2000 NewPower IPO.  Similarly, although Kenneth
L. Lay, Lou L. Pai, James V. Derrick and Richard A. Causey
are named as individual defendants in both the Enron MDL and
the NewPower Litigation, they are named solely in their
capacity as Enron executives, officers, and directors in the
Enron MDL and solely in their capacity as NewPower
executives, officers and directors in the NewPower
Litigation.  The scope of pretrial proceedings related to
the defendants in the Enron MDL will be vastly different

---

[5] Since the commencement of the NewPower Litigation,
NewPower has filed for bankruptcy in the Southern District
of New York.

from the proceedings related to the NewPower defendants,
despite these four individuals having being named in both
complaints.

In short, the Enron MDL and the NewPower
Litigation deal with different events, different disclosures
and different time periods, and will therefore require
separate and distinct proceedings.   Therefore, this Panel
should vacate CTO-1 and CTO-3.

III.  TRANSFER WOULD BE INCONVENIENT TO MANY OF THE NEWPOWER
      PARTIES, THEIR ATTORNEYS, AND MANY OF THE POTENTIAL
      WITNESSES.

Among the reasons this Panel centralized the
original Enron MDL proceeding in the Southern District of
Texas was "a strong Texas nexus".   Transfer Order at 3-4.
The Transfer Order noted that "many parties, witnesses and
documents will be found in Houston, where Enron is
headquartered and where Enron's auditors performed much of
their audit work."   Id.   However, a similarly close
relationship does not exist between Houston and NewPower.
Instead, the NewPower Litigation has strong ties to the New
York area, where it is currently located.   Thus, transfer of
the NewPower Litigation to Houston would inconvenience the
NewPower plaintiffs, most of the NewPower defendants, and
most of the parties' attorneys.

First, NewPower has its principal place of
business in Purchase, New York.   Consequently, most of

12

NewPower's documents and employees are located near the
federal courthouse in White Plains where the NewPower
Litigation is pending.  Defendant Grauer is employed in the
New York area, and the Underwriter Defendants all have their
relevant offices in the New York Area.  Thus, many of the
likely witnesses in the NewPower Litigation live in the New
York area and the bulk of the relevant documents should be
in the New York area.

Second, in contrast to the Enron MDL, in which
cases were originally filed throughout the country, all
eleven of the now consolidated NewPower complaints were
originally filed in the Southern District of New York.
Concentration of these cases in the Southern District of New
York reflects the fact that New York is a central location,
convenient for both the parties and the witnesses in the
NewPower Litigation.  Moreover, virtually all the parties in
the NewPower Litigation are represented by New York Counsel.

IV.  BECAUSE THE TWO ACTIONS ARE SEPARATE AND DISTINCT,
     TRANSFER OF THE NEWPOWER LITIGATION TO THE ENRON MDL
     WOULD NOT PROMOTE THE JUST AND EFFICIENT CONDUCT OF
     EITHER ACTION.

Transfer of the NewPower Litigation to Houston for
pretrial proceedings would not be an efficient use of the
valuable resources of the judicial system.  As noted above,
the NewPower allegations are limited in nature:  The
NewPower plaintiffs bring claims exclusively under the
federal securities laws, and discovery will focus primarily

13

on the accuracy of the Registration Statement for the
NewPower IPO and the due diligence of the Underwriter
Defendants in connection with that IPO.  In contrast, the
Enron MDL allegations are numerous and span several years,
numerous Enron securities offerings and numerous Enron
disclosures.  Discovery will be broad, covering a multitude
of witnesses, documents and factual allegations that are
unrelated to NewPower and the NewPower IPO.  While the goal
of the Enron MDL Transfer Order is to streamline the
pretrial process for Enron claims, transfer in the instant
case will have the opposite effect, unnecessarily
complicating both the NewPower Litigation and the Enron MDL.

      Transfer of the NewPower Litigation to Houston
also would unfairly prejudice the numerous parties in the
NewPower Litigation who are not involved in the claims of
Enron shareholders and participants in the Enron retirement
savings plan.

      To the extent there is overlap between discovery
in the NewPower Litigation and in the Enron MDL, duplication
can be avoided by informal coordination between the two
courts and by making relevant discovery taken in the Enron
MDL available in NewPower.

## Conclusion

For the foregoing reasons, the Underwriter Defendants and Defendant Grauer respectfully request that CTO-1 and CTO-3 be vacated as they relate to the NewPower Litigation.

July 10, 2002                 Respectfully submitted,


                              Richard W. Clary
                              Julie A. North
                              CRAVATH, SWAINE & MOORE
                              Worldwide Plaza
                              825 Eighth Avenue
                              New York, NY 10019-7475
                              (212) 474-1000

                              Attorneys for Defendants
                              CREDIT SUISSE FIRST BOSTON
                              CIBC WORLD MARKETS CORP.
                              PAINE WEBBER, INC.
                              SALOMON SMITH BARNEY, INC.
                              DONALDSON, LUFKIN & JENRETTE
                                SECURITIES CORP.
                              DLJDIRECT, INC.
                              CHASE SECURITIES, INC. and
                              PETER GRAUER

Exhibit A

From: Courthouse News NY To: Robert Zwillich          Date: 3/13/2002 Time: 1:19:10 PM                    Page 2 of 29

# JUDGE BRIEANT

**ABRAHAM & PASKOWITZ**
Laurence D. Paskowitz (LP-7324)
Jeffrey S. Abraham (JA-2946)
One Penn Plaza—Suite 1910
New York, New York 10119
(212) 714-2444 (tel.)
(212) 279-3655 (fax)

# 02 CV 1550

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT NEW YORK

-------------------------------------------------------X

PETER A. PFAU, JOSEPH HARRE, and
JAMES CASEY LIPPMEIER,

           Plaintiffs,

        vs.

H. EUGENE LOCKHART, KENNETH L.
LAY, LOU L. PAI, JAMES V. DERRICK, JR.,
RICHARD A. CAUSEY, WILLIAM I.
JACOBS, PETER GRAUER, LINDA G.
ALVARADO, RAY J. GROVES, CREDIT
SUISSE FIRST BOSTON, INC.,
DONALDSON, LUFKIN & JENRETTE
SECURITIES CORP., CHASE SECURITIES,
INC., CIBC WORLD MARKETS CORP.,
PAINE WEBBER, INC., SALOMON SMITH
BARNEY, INC., DLJDIRECT, INC., and
NEWPOWER HOLDINGS, INC.,

           Defendants.

-------------------------------------------------------X

C.A. No.

**CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE
SECURITIES LAWS**

**JURY TRIAL DEMANDED**

## COMPLAINT

    Plaintiffs, by and through their attorneys, allege the following Complaint based upon the

investigation of counsel, except as to those allegations concerning Plaintiffs, which are alleged

upon personal knowledge. Counsel's investigation included: (a) review and analysis of public

i

filings made by NewPower Holdings, Inc. ("NewPower" or the "Company"), with the Securities and Exchange Commission; (b) review and analysis of securities analyst's reports concerning NewPower; (c) review and analysis of press releases and other publications disseminated by defendants; and (d) other information about NewPower, including proprietary information.

## JURISDICTION AND VENUE

1.      This Court has jurisdiction over the subject matter of this action pursuant to Sections 27 of the Securities Exchange Act of 1934, 15 U.S.C. §78aa, and Section 22 of the Securities Act of 1933, 15 U.S. C. § 77v, and pursuant to 28 U.S.C. §§1331 and 1337. The claims asserted herein arise under and pursuant to Section 10(b) of the Securities Exchange Act, and Rule 10b-5 promulgated thereunder, and Section 11 of the Securities Act, and they present federal questions.

2.      Venue is proper in this judicial district pursuant to Section 27 of the Securities Exchange Act, Section 22 of the Securities Act, and pursuant to 28 U.S.C. §1391(b). A substantial number of the false and misleading statements complained of were knowingly disseminated into this District by the Defendants, and many of the defendants, including defendant NewPower, maintain their principal places of business in this District.

3.      In connection with the violations of law alleged herein, the defendants used the means and instrumentalities of interstate commerce including the United States mails, interstate wire and telephone facilities, and the facilities of the national securities markets and the Internet to distribute the false and misleading statements complained of herein.

2

# FACTUAL ALLEGATIONS

## A.   Summary of Claims

4.      This action is brought as a class action on behalf of all persons who purchased NewPower common stock from October 5, 2000 through December 5, 2001 (the "Class Period"). Plaintiffs' claims arise under Section 11 of the Securities Act of 1933 and Section 10(b) of the Securities Exchange Act of 1934. Section 11 provides a remedy for material misrepresentations and omissions from Prospectus and Registration Statement issued in connection with the Company's October 5, 2000 initial public offering. Section 10(b) provides a remedy for damages caused by intentional or reckless misrepresentations or omissions of material facts in public statements and filings with the SEC made during the Class Period.

5.      NewPower is a nationwide provider of electrical power and natural gas to small retail consumers. It was formed by Enron in 1999, and Enron remains its controlling shareholder. New Power's top officers and directors are primarily persons closely affiliated with Enron, or who were hand-picked by Enron. Like Enron, New Power engaged in a pattern of misleadingly described policies and transactions throughout the Class Period which served to mask the true nature of New Power's business, and its financial condition. Many of the misrepresented or omitted facts could have been ascertained by NewPower's directors, and by the underwriters of NewPower's October 5, 2000 initial public offering ("IPO"), through the exercise of reasonable due diligence. These directors and underwriters--all of whom are named as defendants herein--failed to exercise reasonable due diligence, in accordance with their statutory duty under Section 11 of the Securities Act.

6.      As detailed more fully below, the Prospectus for the IPO represented that

3

From: Courthouse News NY  To: Robert Zwillich          Date: 3/13/2002 Time: 1:19:16 PM                    Page 5 of 29

NewPower could succeed in a volatile energy market (where other similar companies had failed) through sophisticated risk management strategies conceived and largely managed by its affiliate, Enron Energy Services, Inc. ("EES"), an Enron subsidiary. In truth and in fact, neither EES nor NewPower had identified any hedging strategies which could enable NewPower to operate profitably under market conditions prevailing at the time of the IPO or, indeed, at any time thereafter. Indeed, in August of 2001, nine months after the IPO, whistleblower Margaret Ceconi, an EES executive, informed defendant Lay, a NewPower director, that EES had failed for two years (i.e., since in or about 1999) in "almost all" of its energy sales purportedly involving hedging attempts, and had been reporting losses on hedging contracts *as gains*. This information regarding EES's true experience in hedging energy contracts in a volatile market was well-known to EES executives like Ceconi. These executives would not have concealed this information if asked for details. Such information was therefore available at the time of the IPO to persons conducting professional due diligence, who were required to conduct an independent analysis of EES's hedging and risk management operations in order to ensure the accuracy of the Prospectus. The defendants failed to so inquire, as was required of them pursuant to their statutory duty to conduct reasonable due diligence.

7.      The IPO Prospectus also made it appear that Enron and its affiliates were stalwart investors who were long-term investors in the Company, and believers in its prospects for success. In truth and in fact, the Prospectus failed to reveal that Enron believed NewPower shares would decline from the IPO price, and had indeed acted on this belief. In a maneuver that may be unique in corporate history, Enron's CFO, Andrew Fastow, had set up a partnership known as "Raptor III", whose purpose was to hedge Enron's position against such an anticipated decline in NewPower's stock. He did this so that Enron would not have to record

4

From: Courthouse News NY  To: Robert Zwillich

such a decline on its books.  Although the Prospectus purported to describe fully the relationship

between Enron, its affiliates, and NewPower, and all of their related party transactions, it failed

to fully disclose the extremely troubling and material Raptor transactions.  Had the investors

known of the true nature of these transactions, the IPO could not have gone forward or, if it did,

would have gone forward at a much lower price.  The facts regarding Raptor III, its hedging

transactions and their purpose could have been ascertained through reasonable inquiries of the

Enron executives involved in these transactions, and their accountants and attorneys.

        8.      As a result of these various misrepresentations and omissions, defendants were

able to dump New Power shares onto unsuspecting public investors at an IPO price of $21 per

share, yielding net proceeds to NewPower of $543 million.  As the true nature of New Power's

business operations was revealed over the course of the next few months (including various

machinations which served to enrich Enron), the stock price declined.  By February 26, 2002, the

closing stock price stood at only 90 cents per share.

        9.      The motivation of the NewPower and Enron executives to conceal facts from the

investing public, or to engage in due diligence that was less than thorough, was to enable

NewPower to raise money for a company operating in a market niche where economic

conditions appeared to render successful operations close to impossible.  Raising public money

shifted the cost of NewPower's inevitable business failure away from Enron (to the extent

possible), and onto the shoulders of public investors.

        10.     The managing underwriters of the IPO, Credit Suisse First Boston, Inc. and

Donaldson Lufkin & Jenrette Securities Corp. ("DLJ" or "Donaldson"), had an egregious

conflict of interest.  These two underwriters were in the process of merging their businesses, and

Donaldson was a major shareholder of NewPower--it beneficially owned approximately 8% of

NewPower's capital stock. Included in these holdings were warrants which had a potential value of well over $100 million at the time of the IPO. This gross conflict of interest clouded the judgment of these managing underwriters, and affected their ability to conduct the type of independent due diligence which is expected by members of the investing public, and owed to these investors under Section 11 of the Securities Act.

**B.      NewPower is Formed and Raises Money Pursuant to a False and Misleading IPO Prospectus**

11.      NewPower was initially formed by Enron in 1999 as TNPC, Inc., a name which it maintained until shortly after its IPO. Its stated business plan was to take advantage of deregulation in the market for retail consumer power. During the first half of the year 2000, however, many companies had tried to compete for retail customers in this deregulated market, and had failed to find a business model which would allow them to generate sufficient profit margins to maintain a viable business. For example, just prior to NewPower's October 2000 IPO, several companies had determined that operating in NewPower's key target markets of Pennsylvania and New Jersey was unviable due to the need to purchase energy at high wholesale prices. These companies included Connectiv, KeySpan Energy Services and DTE Edison America. Volatile costs were especially dangerous for companies like NewPower, which did not have their own generating capacity, but had to acquire necessary capacity on the spot market or by entering into long term contracts (sometimes referred to as "forward contracts").

12.      Market concerns as to why NewPower would succeed where others failed were addressed by New Power through claims that it was in a better position than its competitors due to its special relationship with Enron, which purportedly (through EES) had the ability to obtain energy for New Power at reasonable wholesale prices, and to help NewPower "hedge" against volatility in market prices so that the Company could remain competitive. Indeed, in an article

6

published by the respected trade publication *Retail Services Report* on September 1, 2000

(approximately one month prior to the initial public offering), NewPower's assurances in this

regard were explicit: "Eugene Lockhart, President and CEO of The New Power Company, said

his firm can succeed, despite such conditions [in the wholesale pricing markets], because

Enron's huge presence in wholesale markets will allow it to control costs."

     13.    The Prospectus for the IPO echoed these assurances. It repeatedly emphasized

the skill and expertise Enron would provide in assisting the Company to economically obtain

necessary power supplies, and to hedge against market volatility. The Prospectus specifically

stated (at p. 26) (emphasis added):

> We were formed by Enron Corp., the largest trader and marketer of electricity and
> natural gas in North America, to target the rapidly restructuring residential and
> small commercial markets for these products. *We believe we are uniquely
> positioned to succeed because of our access to Enron's technical resources,
> regulatory and risk management expertise, and reliable wholesale commodity
> purchasing power.*

     14.    The Prospectus also emphasized NewPower's purported hedging strategies

against price volatility (*id.* at 8): "We intend to manage our wholesale commodity price risk by

implementing a risk management strategy that will hedge against large price fluctuations in the

wholesale energy markets." In truth and in fact, NewPower had no viable plan to hedge against

volatile prices that was superior to the plans already unsuccessfully pursued by competitors. Nor

did NewPower have any reasonable plan to manage the risk involved in buying energy at high

prices and selling it back to consumers at the lower prices set by contract, by regulators and by

market forces. Its true plan--which was to purchase forward contracts and capacity from Enron

and its affiliates and to provide Enron with cash security in order to protect *Enron* from volatility

if energy prices decreased--*increased* the Company's risk of business failure, and served

primarily to advance the interests of Enron. EES had followed these same strategies for a

From: Courthouse News NY  To: Robert Zwirlich                Date: 3/13/2002  Time: 1:19:10 PM                        Page 9 of 29

considerable length of time, and its key executives knew they were in almost all cases unsuccessful. This failure to successfully manage commodity pricing risk was known within EES, and this information could have been discovered by defendant Lou L. Pai through reasonable due diligence, as Pai was not only NewPower's Chairman of the Board but also, at the time of the IPO, Chairman and CEO of EES. It was reported by Dow Jones Newswire on February 26, 2002 that at one point Enron executives participated in setting up a phony EES trading floor in Houston to impress Wall Street analysts who wanted a closer look at the operation. Had the true nature of the EES business operations been described in the Prospectus, no shares could have been sold, or would have been sold at a far lower price.

15.    The NewPower IPO closed on October 5, 2000, yielding net proceeds of $543 million, which purportedly was sufficient for NewPower to carry forward its business plan for at least 24 months . (Prosp. at 12). Given the conditions in the energy markets, and the history of EES, the defendants should have known, in the exercise of reasonable due diligence, that such proceeds could not carry the Company through one year of successful operations, let alone 24 months.

16.    The following allegations of this Complaint (except as otherwise specified) pertain only to the conduct of those defendants who were insiders of Enron and/or NewPower (the "Insider Defendants", as defined in ¶40, *infra* ), and do not pertain to the conduct of the Outside Director Defendants (as defined at ¶40, *infra*), or the Underwriters Defendants (as defined at ¶41, *infra*), which defendants are only charged with liability for negligence under Section 11 of the Securities Act in connection with the Registration Statement and Prospectus, and are not charged herein with reckless, intentional or fraudulent misconduct, with the

8

exception of defendant Donaldson Lufkin & Jenrette Securities Corp., which had a special motive to commit fraud.

C.    **Misrepresentations Continue Subsequent to the IPO Until the Collapse of Enron**

17.    Following the successful close of the IPO, the Insider Defendants repeatedly emphasized positive news about NewPower's business, while falsely downplaying or omitting adverse facts. When the Company reported poor results, ancillary factors were blamed for these disappointments, while the primary reasons were concealed.

18.    On October 19, 2000, NewPower announced that it had been awarded a contract to service up to 300,000 electricity customers formerly serviced by PECO Energy in Pennsylvania. The contract was awarded pursuant to a deregulation plan developed by the Pennsylvania Public Utility Commission. Defendant Lockhart stated: "In addition to our core business model, we believe this is another opportunity for The New Power Company to leverage our capability to offer best-in-class, nationally recognized products and services to residential customers in deregulated markets, and we look forward to providing service to these customers." Nowhere did Lockhart or NewPower reveal that it had no ability to obtain necessary electrical power for these customers on a basis which would provide sufficient profit margins to sustain the Company's business plan. Nor did it reveal that arrangements with EES for obtaining the needed power would require NewPower to post collateral which would sap NewPower's ability to operate effectively, and which would enrich Enron. Indeed, as the months went by, and these contracts went into full operation, NewPower falsely presented them as representing no risk.

19.    For example, in its Form 10-Q quarterly report for the period ending

9

March 31, 2001, issued on May 14, 2001, NewPower discussed the Company's collateral

obligations under power contracts in a manner which outright stated that there was no risk of the

loss of the collateral (*id.* at 8):

> State regulations, as well as certain of NPW's counterparties, require collateral to ensure
> fulfillment of NPW's commitments. To meet these commitments, NPW has provided
> cash collateral of $77.9 million as of March 31, 2001. ***The collateral will revert to
> NPW's control upon successful completion by NPW of specified commitments.***

20.     In that same report, NewPower listed forward contracts that locked in energy

purchases at high prices, but the Company assured investors that there was limited risk from this

due its hedging strategies, which it stated were modeled after those of Enron (*id.* at 18)

(emphasis added):

> We utilize derivative commodity instruments to hedge future purchases of commodities
> to be provided to our customers. The purpose of our hedging strategy is to achieve a
> more predictable cash flow, *as well as to reduce our exposure to adverse price
> fluctuations of commodities.* While the use of these hedging arrangements limits the
> downside risk of adverse price movements, they may limit future revenues from
> favorable price movements.

21.     At no point in the May 14, 2001 report or in any previous report did NewPower

mention that any of the collateral it was posting under its power contracts with Enron or

otherwise was at risk of loss or was adversely affecting the Company's cash and liquidity needs,

or its business plan.  Nor did it indicate that it was materially deficient in hedging these

contracts--indeed, it assured that just the opposite was true.  Meanwhile, the amount of posted

collateral to Enron and others grew steadily.  It went from $13 million at December 31, 2000 to

$77.9 million at March 31, 2001 and to $156 million at June 30, 2001.  Although it was difficult

to notice, buried in the quarterly report for the June 30, 2001 quarter, dated August 14, 2001,

NewPower began backing away from its blanket statement that all collateral would return to it:

> Certain state regulations, as well as certain of NPW's counterparties,
> require collateral to ensure fulfillment of NPW's commitments. To meet these

requirements, NPW has provided cash collateral of $145 million as of June 30, 2001. *A substantial portion of the collateral will revert to NPW's control upon successful completion by NPW of specified commitments.* Such collateral is reflected as restricted cash in the accompanying balance sheets.

22.    That second quarter, ending June 30, 2001, was disastrous for NewPower, as that quarter involved the commencement of electricity service to PECO customers on a large scale. Nonetheless, by failing to establish adequate reserves for likely losses from its forward contracts with EES that would have added to the cost of sales, NewPower was able to report a positive gross margin on sales of $64 million. Defendant Lockhart blamed regulatory actions for a diminished outlook for the Company's operations. He said in an August 7, 2001 press release:

> Our second quarter results reflect the strength of NewPower's business model. While the mild weather that the country experienced in the second quarter reduced the volumes of energy that our customers consumed, we achieved excellent customer growth. We encountered unexpected stresses on the business in the second quarter from regulatory actions outside of our control. These external forces had a negative impact on revenue and margin in the Pennsylvania and New Jersey markets (PJM) and the Texas market (ERCOT). Consequently, we have taken actions to achieve our bottom line targets and conserve cash.

23.    Lockhart and the other Insider Defendants knew that this statement was false and misleading, as its oppressive forward contracts with Enron, the imbalance between its energy costs and the amount it could collect from consumers, and the risk it would lose much of the collateral it had posted, all together made it highly unlikely (if not impossible) that New Power would achieve its "bottom line targets." Rather, in truth and in fact, it was highly *unlikely* that the Company could continue in business much longer.

24.    Thus, while NewPower and the Insider Defendants blamed its increasingly disappointing financial performance on outside factors beyond its control, such as regulatory actions or mild weather, they schemed to omit mention of the true reasons the Company was drastically cutting costs–*i.e.*, that it did not have its claimed hedging system against high prices

11

in place (either independently or with the aid of Enron), and that collateral obligations did indeed
carry a material risk of loss which was sapping NewPower's ability to tap enough resources to
successfully carry out its business plan. Each adverse financial report sent the stock
plummeting, and the stock would have plummeted further had the true facts behind the
disappointing financial performance been known.

     25.    When Enron itself collapsed amid scandal in the fall of 2001, NewPower
executives and directors realized that the spotlight would soon be turned on them. Finally, and
belatedly, they began to disclose that they had no substantial hedges in place, and that, contrary
to their repeated representations, a substantial portion (and perhaps all) of the enormous
collateral they had posted was at risk of loss.  On October 19, 2001, NewPower released a slew
of public filings describing in detail for the first time its various agreements with Enron and
EES, and their implications. Its report on SEC Form 8-K issued on that date stated, in relevant
part (emphasis supplied):

> Since its inception, NewPower has a policy of hedging its customer contracts by
> purchasing gas or electricity for future delivery, based on expected future delivery
> volumes. When gas and electric prices decline significantly, as they have in recent
> months, the amount of collateral that NewPower is required to post under the Master
> Netting Agreement increases as determined under mark-to-market comparisons, which
> compare the contract price of the commodity against the current market price.
> Accordingly, (i) the substantial increase in the number of customers NewPower has
> acquired since the Fall of 2000 has required a correspondingly large increase in forward
> transactions, which transactions entered into with the Enron Subsidiaries are secured
> under the Master Netting Agreement, and (ii) the recent substantial decline in commodity
> prices has required a significant increase in the cash collateral provided to the Enron
> Subsidiaries. As of September 30, 2001, NewPower had provided the Enron Subsidiaries
> $109,300,000 of cash collateral under the Master Netting Agreement; however, this
> amount can vary on a daily basis as a result of the overall net value of the Underlying
> Contracts.
>
> *Any significant increase in the amount of collateral that NewPower is
> required to post to the Enron Subsidiaries, as a result of further declining gas
> and electric prices, additional transactions or otherwise, could adversely
> affect the Company's liquidity and financial resources.* If NewPower were unable
> to post the required amount of cash collateral under the Master Netting
> Agreement, the Enron Subsidiaries would be entitled to (i) declare a default

under all the Underlying Contracts with NewPower, (ii) terminate those agreements and (iii) foreclose on the collateral previously posted by NewPower to secure them. Any such declaration, termination or foreclosure would have a material adverse effect on the Company and its ability to conduct its business.

In addition, NewPower builds up natural gas inventories in the third and fourth quarters of each year, which creates a cash flow timing difference between the purchase of this inventory and the receipt of revenues from natural gas sales to customers. As of September 30, 2001, NewPower has purchased gas in inventory for winter sales in the amount of $78 million.

Given its limited unrestricted cash resources, the Company has intensified its efforts to reduce expenses and to prioritize its market entry and customer acquisition strategies. During the remainder of 2001, the Company expects to continue reducing its spend rate so that for the second half of 2001 the Company will have reduced expenses by over 40 percent from that prevailing in the first half of 2001.

26.     Thus, in truth, the collateral postings were not guaranteed to return to NewPower completely or even substantially (as had been previously represented), but were at risk of being seized by the creditor, Enron.  NewPower misrepresented the true risk the Enron forward contracts presented because the revelation of the truth would have led to investor suspicions about the very viability of NewPower's business plan, its ability to hedge against higher prices, the adequacy of its liquid resources, and the fairness of its dealings with Enron.

27.     On December 5, 2001, the last day of the Class Period, NewPower announced that its contracts with Enron had been terminated and that NewPower would report a charge for the losses it would incur on its collateral postings "in the range of $110 million based on recent market prices." On February 20, 2002, NewPower publicly admitted in substance that it was unable to operate as an independent company (a fact which was ascertainable from the time of the IPO), and that it was in talks to be acquired by the English company Centrica p.l.c., for $1.05 a share.

28.     On February 23, 2002, NewPower announced a definitive agreement to be acquired by Centrica for a price that may range from 80 cents on the low side to $1.30 per share on the high side (depending on certain contingencies).  Not surprisingly, Centrica refused to accept a large portion of NewPower's customer base because of the limited profitability potential of continuing to serve them, a fact NewPower concealed until the announcement of the Centrica

deal, but which had slowly dawned on the market after the collapse of Enron, and the revelations about Enron and EBS. NewPower also announced abysmal operating results for the year ending December 31, 2001. The charge against the Enron contracts was now estimated to be $90 million, but after a loss of $213 million for the year, the Company was down to only $26 million in unrestricted cash, leaving it close to insolvency.

## PARTIES

29.   Plaintiffs purchased shares of NewPower common stock during the Class period, as set forth on the attached Certifications.

30.   NewPower is a public company which maintains its principal executive offices at One Manhattanville Road, Third Floor, Purchase, New York 10577. The Company was formed by Enron in 1999, and began servicing retail customers in Pennsylvania and New Jersey in August 2000. It acquired approximately 285,000 customers in eight states from Columbia Energy Group in late 2000, along with approximately 300,000 retail customer from PECO Energy Co. in October 2000. NewPower is approximately 44% owned by Enron and its affiliates. It has 62.8 million common shares outstanding, which trade on the New York Stock Exchange, an open, developed and efficient market, under the symbol "NPW." The Company raised $543 million pursuant to its October 5, 2000 IPO through the sale of 27.6 million common shares at a price of $21 per share.

31.   Defendant H. Eugene Lockhart ("Lockhart") joined NewPower in February 2000 as President and Chief Executive Officer. In April 2000, Lockhart was elected to serve on the NewPower Board of Directors. At the time of the IPO, Lockhart owned 208,476 shares of NewPower common stock. Under Lockhart's employment agreement, he received stock options to purchase 678,000 shares of common stock at an exercise price of $3.88 per share, and

14

stock options to purchase 1,290,000 shares of common stock at the initial public offering price. These options were valued as worth, upon grant, approximately $15.8 million. Lockhart also received $4,000,000 in restricted stock upon consummation of the offering. In the year 2000, Lockhart received salary and bonus of in excess of $2 million. Lockhart signed the Registration Statement for NewPower's public offering.

32.     Defendant Kenneth L. Lay ("Lay") was a member of the NewPower Board of Directors from January 2000. He was Chairman of the Board and Chief Executive Officer of Enron Corp. for over 15 years, serving from 1985, until his recent resignation. Lay sold $101 million of Enron stock while in possession of material, nonpublic information regarding Enron, EES and NewPower. Lay signed the Registration Statement for NewPower's public offering.

33.     Defendant Lou L. Pai ("Pai") is Chairman and a member of the NewPower Board of Directors, positions has held from November 1999. He was Chairman and Chief Executive Officer of EES, a position he held from March 1997 through February 2001. Pai owns 3.43 million shares of NewPower stock. Pai sold $353 million of Enron stock while in possession of material, nonpublic information rearguing Enron, EES and NewPower. Pai signed the Registration Statement for NewPower's public offering.

34.     Defendant James V. Derrick, Jr. ("Derrick") was a member of the NewPower Board of Directors from January 2000 until his recent resignation. He was, throughout most of the Class Period, Executive Vice President and General Counsel of Enron, a position he held since June 1991. Derrick signed the Registration Statement for NewPower's public offering.

35.     Defendant Richard A. Causey ("Causey") was elected to the NewPower Board of Directors on September 1, 2000, and served until his recent resignation. He was, throughout most of the Class Period, Executive Vice President and Chief Accounting Officer of Enron, a

position he held since July 1999. From July 1997 to July 1999, Causey served as Senior Vice President of Enron and its Chief Accounting Officer, and from July 1992 to July 1997 served in various capacities at Enron Capital & Trade Resources Corp., a subsidiary of Enron now known as Enron North America Corp. Prior to joining Enron in 1992, Causey was a Senior Manager with Arthur Andersen & Co. in Houston, Texas. Causey sold $13 million of Enron stock while in possession of material, nonpublic information regarding Enron, EES and NewPower. Causey signed the Registration Statement for NewPower's public offering.

36.     Defendant William I. Jacobs ("Jacobs") served as NewPower's Managing Director and Chief Financial Officer, a position held since joining the Company in June 2000. Effective as of July, 2000, Jacobs also served as a member of the Board of Directors. Prior to that time, from January 1999 to June 2000, Jacobs served as a Senior Executive Vice President. Jacobs signed the Registration Statement for NewPower's public offering.

37.     Defendant Peter Grauer ("Grauer") has been a member of the NewPower Board of Directors since June 2000. He was a Managing Director of DLJ Merchant Banking, Inc. from September 1992. In or about late 2000, he became Managing Director of Credit Suisse First Boston Private Equity's Leveraged Corporate Private Equity Group. Credit Suisse Group acquired DLJ, Inc. on or about November 3, 2000. From April 1989 to September 1992, he was a Co-Chairman of Grauer & Wheat, Inc., an investment firm specializing in leveraged buyouts. Grauer signed the Registration Statement for NewPower's public offering.

38.     Defendant Linda G. Alvarado ("Alvarado") became a member of the NewPower Board of Directors upon the completion of the offering, and was listed in the Prospectus and Registration Statement as a person "who, with his consent, is named in the registration statement as being or about to become a director." Alvarado is therefore subject to liability under Section

16

11(a)(3) of the Securities Act for misrepresentations or omissions in such Registration Statement. Alvarado is also a co-owner of he Colorado Rockies Baseball Club.

39.     Defendant Ray J. Groves ("Groves") became a member of the NewPower Board of Directors upon the completion of the offering, and was listed in the Prospectus and Registration Statement as a person "who, with his consent, is named in the registration statement as being or about to become a director." Groves is therefore subject to liability under Section 11(a)(3) of the Securities Act for misrepresentations or omissions in such Registration Statement. Groves has been Chairman of Legg Mason Merchant Banking, Inc. since February 1995. Groves retired as Chairman and Chief Executive Officer of Ernst & Young in September 1994, which position he had held since 1977.

40.     Defendants Lockhart, Lay, Derrick, Causey and Jacobs are referred to in this Complaint as the "Insider Defendants." Defendants Pai, Grauer, Alvarado and Groves are referred to in the Complaint as the "Outside Director Defendants."

41.     Defendants Credit Suisse First Boston Corp., CIBC World Markets Corp, Paine Webber, Inc., Salomon Smith Barney, Inc. and DLJDirect, Inc. (the "Underwriter Defendants") served as the co-managing underwriters of the NewPower IPO, and as representatives of a syndicate of 24 underwriters. The Underwriter Defendants are sued herein in their own right and as representatives of a defendant class of all 24 underwriters. The Prospectus specifically states that all 24 underwriters are "represented by" the Underwriter Defendants for the purpose of conducting the offering.

## CLASS ACTION ALLEGATIONS

### Plaintiff Class

42.     This is a class action on behalf of purchasers of NewPower stock between October 5, 2000 and December 5, 2001 (the "Class Period"), excluding defendants (the "Class").

Class members are so numerous that joinder of them all is impracticable.

43.     Common questions of law and fact predominate as to the Section 11 claims asserted against all defendants, and include whether defendants: (i) violated the 1933 Act; (ii) whether the Registration Statement and the Prospectus incorporated therein omitted and/or misrepresented material facts; and (iii) the measure of damages.

44.     Common questions of law and fact predominate as to the Section 10(b) claims asserted against all Insider Defendants and Defendant Donaldson Lufkin, and include whether the Insider Defendants: (i) violated the 1934 Act; (ii) whether the Registration Statement and the Prospectus incorporated therein and public statements issued during the Class Period omitted and/or misrepresented material facts; (iii) whether statements made during the Class period were made with scienter; and (iv) the measure of damages.

45.     Plaintiffs' claims are typical of those of the Class.  Prosecution of individual actions would create a risk of inconsistent adjudications.  Plaintiffs will adequately protect the interests of the Class.  A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

**Defendant Class**

46.     This action is also brought as a class action on behalf of purchasers of NewPower stock between October 5, 2000 and December 5, 2001 (the "Class Period") with regard to the claims asserted under Section 11 of the Securities Act against a defendant Class consisting of all 24 underwriters of the NewPower IPO, to be represented by the Underwriter Defendants, who also represented them in connection with the offering, as stated on page 66 of the Prospectus.

47.     Members of the defendant class are so numerous that joinder of them is impracticable.

18

48.     Common defenses of law and fact predominate as to the Section 11 claims asserted against all defendants, and include whether defendants: (i) violated the 1933 Act; (ii) whether the Registration Statement and the Prospectus incorporated therein omitted and/or misrepresented material facts; (iii) whether the Underwriter Defendants undertook a reasonable investigation of the truth of the Registration Statement and the Prospectus incorporated therein; and (iv) the measure of damages.

49.     The Underwriter Defendants' defenses will be typical of those of the Class. Prosecution of individual actions against each defendant would create a risk of inconsistent adjudications.  The Underwriter Defendants will adequately protect the interests of the Class.  A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

### CLAIMS FOR RELIEF

### Count One–Violations of Section 11

50.     Plaintiffs incorporate by reference the previous allegations in ¶¶ 1-16, 42-43 and 45-49.

51.     The Registration Statement and the prospectus contained material misrepresentations of fact and omitted facts necessary to make the facts stated therein not misleading.  Defendant NewPower is strictly liable therefor.

52.     All other defendants violated Section 11 by failing to exercise due diligence to ensure that the Registration Statement and Prospectus contained no material misrepresentations and no omissions of material fact.  Class members were damaged by these violative acts, and by such misrepresentations and omissions.

### Count Two–Violations of Sections 10(b)and 20(a) and  Rule 10b-5

From: Courthouse News NY  To: Robert Zwillich                    Date: 3/13/2002  Time: 1:19:10 PM                    Page 21 of 29

53.     Plaintiffs incorporate by reference all previous allegations, except those in ¶¶50–52. The Insider Defendants and defendant Donaldson Lufkin Jenrette Securities Corp. violated § 10(b) and Rule 10b-5 by:

      (a)     Employing devices, schemes and artifices to defraud;

      (b)     Making untrue statements of material facts and omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and

      (c)     Engaging in acts, practices and a course of business that operated as a fraud or deceit upon the Class in connection with their purchases of NewPower stock.

54.     Class members were damaged by reason of these wrongful acts. In reliance on the integrity of the market, they paid artificially inflated prices for NewPower stock.

55.     The undisclosed adverse information concealed by defendants during the Class Period is the type of information which, because of SEC regulations, regulations of the national stock exchanges and customary business practice, is expected by investors and securities analysts to be disclosed and is known by corporate officials and their legal and financial advisors to be the type of information which is expect to be and must be disclosed. To the extent any statements made by defendants during the Class period purport to be "forward looking statements", the safe harbor provided by the Private Securities Litigation Reform Act ("PSLRA") does not apply , as defendants knew or recklessly disregarded that such statement were untrue or lacked a reasonable basis.

56.     Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for NewPower stock. Plaintiffs and the Class would not have purchased NewPower stock at the prices they paid, or at all, if they had been

aware that the market prices had been artificially and falsely inflated by defendants' misleading statements.

57.    Each of the Insider Defendants had the ability to exercise control over the public statements issued by and on behalf of NewPower, and failed to act in good faith to assure that each of the statements identified herein as misleading was complete and accurate. These defendants are thus all liable as controlling persons under Section 20(a) of the Exchange Act.

58.    To the extent false and misleading statements were issued by the Company without specific attribution or through a corporate spokesperson, these statements may be considered "group published information", and therefore the product of all Insider Defendants, who comprised a small and discrete control group.  Plaintiffs are not insiders and cannot and are not expected to identify the role of each of the Insider Defendants in each misstatement or omission alleged under this Count prior to discovery.

### REQUEST FOR RELIEF

WHEREFORE, Plaintiffs seek judgment as follows:

(A)    Declaring this action to be a proper class action;

(B)    Determining that plaintiffs have established liability under Section 11 of the Securities Act against those defendants against whom such claims have been asserted.

(C)    Determining that plaintiffs have established liability under Section 10(b) of the Securities Exchange Act against those defendants against whom such claims have been asserted.

21

From: Courthouse News NY  To: Robert Zwillich          Date: 3/13/2002 Time: 1:19:10 PM          Page 23 of 29

(D)     Determining that plaintiffs have established liability under Section 20(a) of the Securities Exchange Act against those defendants against whom such claims have been asserted.

(E)     Awarding damages, including interest, and awarding plaintiffs' counsel and experts' reasonable fees, appointing Pfau lead plaintiff, and awarding reimbursement of reasonably incurred expenses; and

(F)     Such other and further relief as the Court may deem proper.

## JURY DEMAND

Plaintiffs demand a trial by jury.

DATED:

New York, New York
February 27, 2002

ABRAHAM & PASKOWITZ

Laurence D. Paskowitz (LP-7324)
Jeffrey S. Abraham (JA-2946)
One Penn Plaza--Suite 1910
New York, New York 10119
(212) 714-2444 (tel.)
(212) 279-3655 (fax)

OF COUNSEL:
Paul J. Geller
Jack Reise
Cauley Geller Bowman & Coates, LLP
2255 Glades Road
Suite 421-A
Boca Raton, Florida 33431
(560) 750-3000

22

## CERTIFICATION OF PLAINTIFF

I, Peter A. Pfau ("Plaintiff"), declare as to the claims asserted under the federal securities laws, that:

1.  Plaintiff has reviewed the complaint and authorized its filing.

2.  Plaintiff did not acquire the securities that are the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3.  Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.  Plaintiff made the following purchases and sales during the period from 10/5/00-12/05/01:

SHARES PURCHASED

Date of Purchase         No. of Shares                    Price Per Share

[See attached chart]

SHARES SOLD

Date of Sale             No. of Shares                    Price Per Share

[See attached chart]

5.  During the three years prior to the date of this Certificate, Plaintiff has not sought to serve or served as a representative party for a class in an action filed under the federal securities laws.

6.  Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this **23** day of February, 2002.

_____
Peter A. Pfau

## SCHEDULE OF NPW TRANSACTIONS—PETER A. PFAU

### PURCHASES

| DATE BOUGHT/SHARES | PRICE PER SHARE | TOTAL COST |
|---|---|---|
| 2/13/01 260 | 7.70 | 2,031.95 |
| 2/27/01 400 | 6.65 | 2,679.95 |
| 4/04/01 3000 | 5.61 | 16,860.00 |
| 4/06/01 600 | 5.65 | 3,396.00 |
| 4/06/01 5400 | 5.80 | 31,374.00 |
| 4/30/01 1500 | 8.69 | 13,050.00 |
| 5/01/01 1500 | 8.55 | 12,840.00 |
| 5/10/01 1000 | 9.04 | 9,054.95 |
| 5/31/01 1000 | 9.00 | 9,010.00 |
| 5/31/01 1000 | 9.00 | 9,010.00 |
| 5/31/01 2000 | 9.18 | 18,830.00 |
| 7/09/01 500 | 8.46 | 4,244.95 |
| 7/16/01 3000 | 8.20 | 24,630.00 |
| 7/27/01 2500 | 7.10 | 17,775.00 |
| 7/27/01 100 | 7.01 | 715.95 |
| 7/27/01 100 | 7.04 | 718.95 |
| 8/08/01 500 | 5.50 | 2,764.95 |
| 8/22/01 500 | 5.00 | 2,514.95 |
| 8/24/01 500 | 4.66 | 2,344.95 |
| 9/04/01 100 | 4.25 | 439.95 |
| 9/19/01 100 | 3.66 | 380.95 |
| 10/19/01 2000 | 1.22 | 2,480.00 |
| 10/22/01 2500 | 1.30 | 3,300.00 |

From  Courthouse News NY  To  Robert Zwillich

SALES

| DATE OF SALE | SHARES | PROCEEDS |
|---|---|---|
| 2/13/01 | 260 | 1,893.98 |
| 2/27/01 | 400 | 2,635.96 |
| 4/05/01 | 3000 | 17,669.41 |
| 4/09/01 | 100 | 588.02 |
| 4/09/01 | 500 | 2,969.95 |
| 4/09/01 | 500 | 3,009.94 |
| 4/10/01 | 500 | 2,934.95 |
| 4/12/01 | 100 | 592.49 |
| 4/12/01 | 900 | 5,332.36 |
| 4/12/01 | 1000 | 5,934.85 |
| 4/12/01 | 1000 | 5,934.85 |
| 5/01/01 | 500 | 4,259.90 |
| 5/01/01 | 1500 | 12,689.57 |
| 5/02/01 | 1000 | 8,414.76 |
| 5/11/01 | 500 | 4,699.89 |
| 5/11/01 | 500 | 4,694.89 |
| 7/10/01 | 125 | 1,041.26 |
| 7/10/01 | 500 | 4,194.86 |
| 7/10/01 | 3800 | 31,880.93 |
| 7/11/01 | 75 | 609.02 |
| 10/16/01 | 1500 | 2,759.90 |
| 10/16/01 | 2900 | 5,306.82 |
| 10/22/01 | 100 | 107.04 |
| 10/22/01 | 2400 | 2,951.90 |



## SALES SHORT

| DATE | SHARES | PROCEEDS |
|------|--------|----------|
| 7/11/01 | 100 | 831.47 |
| 7/11/01 | 1900 | 15,797.97 |
| 7/12/01 | 100 | 845.47 |
| 7/12/01 | 300 | 2,536.42 |
| 7/12/01 | 600 | 5,072.86 |
| 10/19/01 | 800 | 1,291.95 |
| 10/19/01 | 1200 | 1,973.93 |

## CERTIFICATION OF PLAINTIFF

I, James Casey Lippmeier ("Plaintiff"), declare as to the claims asserted under the federal securities laws, that:

1.  Plaintiff has reviewed the complaint and authorized its filing.

2.  Plaintiff did not acquire the securities that are the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3.  Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.  Plaintiff made the following purchases and sales during the period from 10/5/00-12/05/01:

### SHARES PURCHASED

| Date of Purchase | No. of Shares | Price Per Share |
| --- | --- | --- |
| 12/18/2000 | 100 | 9.625 $ |
| 2/21/2001 | 100 | 7.1 $ |
| 8/7/2001 | 100 | 4.98 $ |

### SHARES SOLD

| Date of Sale | No. of Shares | Price Per Share |
| --- | --- | --- |
| | NONE yet | |

5.  During the three years prior to the date of this Certificate, Plaintiff has not sought to serve or served as a representative party for a class in an action filed under the federal securities laws.

6.  Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 23 day of February, 2002.

_____
James Casey Lippmeier

From Courthouse News NY To: Robert Zwillich          Date: 3/13/2002  Time: 1:19:10 PM                    Page 29 of 29

## CERTIFICATION OF PLAINTIFF

I, Joseph Harre ("Plaintiff"), declare as to the claims asserted under the federal securities laws, that:

1.    Plaintiff has reviewed the complaint and authorized its filing.

2.    Plaintiff did not acquire the securities that are the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3.    Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.    Plaintiff made the following purchases and sales during the period from 10/5/00-12/05/01:

SHARES PURCHASED

| Date of Purchase | No. of Shares | Price Per Share |
|---|---|---|
| 2/21/2001 | 130 | 7.50 |
| 12/13/2000 | 100 | 9.77 |
| 9/25/2001 | 25 | 3.00 |

SHARES SOLD

| Date of Sale | No. of Shares | Price Per Share |
|---|---|---|
| 4/24/2001 | 130 | 7.95 |

Currently hold 125 shares at an average price paid of $8.30

5.    During the three years prior to the date of this Certificate, Plaintiff has not sought to serve or served as a representative party for a class in an action filed under the federal securities laws.

6.    Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 25th day of February, 2002.

Joseph Harre

Exhibit B

RECYCLED

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT NEW YORK

---

PETER A. PFAU, JOSEPH HARRE, and JAMES
CASEY LIPPMEIER,

                                        Plaintiffs,

                    -against-

H. EUGENE LOCKHART, KENNETH L. LAY, LOU
L. PAI, JAMES V. DERRICK, JR., RICHARD A.
CAUSEY, WILLIAM I. JACOBS, PETER GRAUER,
LINDA G. ALVARADO, RAY J. GROVES, CREDIT
SUISSE FIRST BOSTON, INC., DONALDSON,
LUFKIN & JENRETTE SECURITIES CORP.,
CHASE SECURITIES, INC., CIBC WORLD
MARKETS CORP., PAINEWEBBER, INC.,
SALOMON SMITH BARNEY, INC., DLJDIRECT,
INC., and NEWPOWER HOLDINGS, INC.,

                                        Defendants.

02 Civ. 1550 (*CLB*)

*Civil Case
Discovery Plan
and Order*

---

IRVIN SOLOMON,

                                        Plaintiff,

                    -against-

H. EUGENE LOCKHART, KENNETH L. LAY, LOU
L. PAI, JAMES V. DERRICK, JR., RICHARD A.
CAUSEY, WILLIAM I. JACOBS, PETER GRAUER,
LINDA G. ALVARADO, RAY J. GROVES, CREDIT
SUISSE FIRST BOSTON, INC., DONALDSON,
LUFKIN & JENRETTE SECURITIES CORP.,
CHASE SECURITIES, INC., CIBC WORLD
MARKETS CORP., PAINEWEBBER, INC.,
SALOMON SMITH BARNEY, INC., DLJDIRECT,
INC., and NEWPOWER HOLDINGS, INC.,

                                        Defendants.

02 Civ. 1763

---

DORINA MILLER,

                             Plaintiff,

             -against-

H. EUGENE LOCKHART, KENNETH L. LAY, LOU
L. PAI, JAMES V. DERRICK, JR., RICHARD A.
CAUSEY, WILLIAM I. JACOBS, PETER GRAUER,
LINDA G. ALVARADO, RAY J. GROVES, CREDIT
SUISSE FIRST BOSTON, INC., DONALDSON,
LUFKIN & JENRETTE SECURITIES CORP.,
CHASE SECURITIES, INC., CIBC WORLD
MARKETS CORP., PAINEWEBBER, INC.,
SALOMON SMITH BARNEY, INC., DLJDIRECT,
INC., and NEWPOWER HOLDINGS, INC.,

                             Defendants.

02 Civ. 1876

LISA A. WEBER,

                             Plaintiff,

             -against-

H. EUGENE LOCKHART, KENNETH L. LAY, LOU
L. PAI, JAMES V. DERRICK, JR., RICHARD A.
CAUSEY, WILLIAM I. JACOBS, PETER GRAUER,
LINDA G. ALVARADO, RAY J. GROVES, CREDIT
SUISSE FIRST BOSTON, INC., DONALDSON,
LUFKIN & JENRETTE SECURITIES CORP.,
CHASE SECURITIES, INC., CIBC WORLD
MARKETS CORP., PAINEWEBBER, INC.,
SALOMON SMITH BARNEY, INC., DLJDIRECT,
INC., and NEWPOWER HOLDINGS, INC.,

                             Defendants.

02 Civ. 1977

P.3

JACK A. HALPERN, individually and On
  Behalf of All Others Similarly Situated,

                                         Plaintiff,

            -against-

H. EUGENE LOCKHART, KENNETH L. LAY.,
LOU L. PAI, JAMES V. DERRICK, JR., RICHARD
A. CAUSEY, WILLIAM I. JACOBS, PETER
GRAUER, LINDA G. ALVARADO, RAY J.
GROVES, CREDIT SUISSE FIRST BOSTON, INC.,
DONALDSON, LUFKIN & JENRETTE
SECURITIES CORP., CHASE SECURITIES INC.,
CIBC WORLD MARKETS CORP.,
PAINEWEBBER, INC., SALOMON SMITH
BARNEY, INC., DLJDIRECT, INC., and
NEWPOWER HOLDINGS, INC.,

                                         Defendants.

                                                        02 Civ. 2268

VICTOR PARKER, TRUSTEE,

                                         Plaintiffs,

            -against-

NEWPOWER HOLDINGS, INC., H. EUGENE
LOCKHART, LOU L. PAI, WILLIAM I. JACOBS,
STEPHEN NOLAN, KENNETH L. LAY, JAMES V.
DERRICK, RICHARD A. CAUSEY, CREDIT
SUISSE FIRST BOSTON CORP., DONALDSON,
LUFKIN & JENRETTE SECURITIES CORP.,
CHASE SECURITIES INC., CIBC WORLD
MARKETS CORP., PAINEWEBBER INC.,
SALOMON SMITH BARNEY INC., and
DLJDIRECT INC.,

                                         Defendants.

                                                        02 Civ. 2360

PATRICIA O'DONOGHUE, VIRGINIA G. MILLER,
PATRICIA M. MILLER, DANIEL P. MILLER,
DANIEL K. MILLER and KATHLEEN MILLER,

Plaintiffs,

-against-

H. EUGENE LOCKHART, KENNETH L. LAY, LOU
L. PAI, JAMES V. DERRICK, JR., RICHARD A.
CAUSEY, WILLIAM I. JACOBS, PETER GRAUER,
LINDA G. ALVARADO, RAY J. GROVES,
CREDIT SUISSE FIRST BOSTON, INC.,
DONALDSON, LUFKIN & JENRETTE
SECURITIES CORP., CHASE SECURITIES, INC.,
CIBC WORLD MARKETS CORP.,
PAINEWEBBER, INC., SALOMON SMITH
BARNEY, INC., DLJDIRECT, INC., and
NEWPOWER HOLDINGS, INC.,

Defendants.

02 Civ. 2701

CHRISTOPHE J. AMON

Plaintiff,

-against-

H. EUGENE LOCKHART, KENNETH L. LAY, LOU
L. PAI, JAMES V. DERRICK, JR., RICHARD A.
CAUSEY, WILLIAM I. JACOBS, PETER GRAUER,
LINDA G. ALVARADO, RAY J. GROVES, CREDIT
SUISSE FIRST BOSTON, INC., DONALDSON,
LUFKIN & JENRETTE SECURITIES CORP.,
CHASE SECURITIES, INC., CIBC WORLD
MARKETS CORP., PAINEWEBBER, INC.,
SALOMON SMITH BARNEY, INC., DLJDIRECT,
INC., and NEWPOWER HOLDINGS, INC.,

Defendants.

02 Civ. 2798

<<NYLIT-2087165.1;3966N;04/18/02-2:56p>>

P.5

ROSALYN M. HARATZ, on Behalf of Herself and
All Others Similarly Situated,

                    Plaintiffs,

        -against-

H. EUGENE LOCKHART, KENNETH L. LAY, LOU
L. PAI, JAMES V. DERRICK, JR., RICHARD A.
CAUSEY, WILLIAM I. JACOBS, PETER GRAUER,
LINDA G. ALVARADO, RAY J. GROVES, CREDIT
SUISSE FIRST BOSTON, INC., DONALDSON,
LUFKIN & JENRETTE SECURITIES CORP.,
CHASE SECURITIES, INC., CIBC WORLD
MARKETS CORP., PAINEWEBBER, INC.,
SALOMON SMITH BARNEY, INC., DLJDIRECT,
INC., and NEWPOWER HOLDINGS, INC.,

                    Defendants.

02 Civ. 2829

*PAUL E TAG* *Plaintiff*
*H. Eugene Lockhart et al Defendants* *02 CIV 3025*

~~[PROPOSED]~~ CIVIL CASE DISCOVERY PLAN *AND ORDER*

*After hearing counsel this date, see transcript,*

This Court requires that a case shall be ready for trial within 6 months of
the date of the Rule 16(b) conference unless the interests of justice require a longer
period. At the Rule 16(b) conference, counsel stated that due to the nature of the claims
in these actions and the extent of anticipated discovery, more than 6 months is required to
prepare for trial. After hearing counsel on this issue, the Court agrees that justice requires
the granting of a longer period than 6 months for the parties to become ready for trial.

      After consultation with counsel for the parties, the following Proposed
Discovery Plan is adopted. This plan is also a scheduling order pursuant to Rules 16 and
26(f) of the Federal Rules of Civil Procedure.

      This Order is entered subject to the statutory stay of discovery pursuant to
15 U.S.C. § 78-u(b)(3)(B) of the Private Securities Litigation Reform Act of 1995 created
as a result of any defendant filing a motion to dismiss. At least some defendants have
advised the Court that they intend to file a motion to dismiss.

A.      The above-captioned actions shall be [are hereby] consolidated as In re NewPower

Securities Litigation, 02 Civ. _1550_ (CLB) and all future filings shall be made under that Docket Number

B.      Plaintiffs and other investors in NewPower Holdings, Inc. who are interested in serving as lead plaintiff are to file motions to be appointed lead plaintiff on or before April 29, 2002. Opposition papers shall be served and filed on or before May 14, 2002. Reply papers shall be served and filed on or before May 28, 2002. A hearing regarding the appointment of lead plaintiff will be held on _June 5, 2002 at 1:00 P. M_

C.      Lead plaintiff(s) designated by the Court shall file a consolidated complaint no later than 45 days after appointment of lead plaintiff(s) and lead counsel.

D.      Defendants currently anticipate filing motions to dismiss the consolidated complaint. Defendants shall serve and file motions to dismiss no later than 45 days after service of the consolidated complaint. Opposition papers shall be served and filed no later than 30 days after the service of motions to dismiss. Reply papers shall be served and filed no later than 14 days after the service of opposition papers.

E.      Any remaining defendants shall serve and file answers to the consolidated complaint no later than 30 days after the orders deciding the motions to dismiss are entered.

F.      Joinder of additional parties must be accomplished by 3 months after the filing of answers by the defendants.

G.      Amended pleadings may be filed until 3 months after the filing of answers by the defendants.

H.      Class Discovery and Certification:

        1.      Class discovery shall begin concurrently with the filing of defendants' answers and shall be completed within 60 days.

        2.      A motion for class certification shall be served and filed no later than 30 days after the close of class discovery. Opposition papers shall be served and

filed no later than 30 days after service of the motion for class certification. Reply papers shall be served and filed no later than 14 days after service of opposition papers.

      I.     Fact and Expert Discovery:

      1.     The parties have agreed to waive the initial disclosure requirements of Rule 26(a)(1) of the Federal Rules of Civil Procedure. Accordingly, initial disclosures shall not be required.

      2.     First requests for production of documents, if any, shall be served no later than 1 month after the filing of answers by the defendants.

      3.     Interrogatories pursuant to Rule 33.3(a) of the Local Civil Rules of the Southern District of New York shall be served no later than 1 month after the filing of answers by the defendants. Interrogatories pursuant to Rule 33.3(c) of the Local Civil Rules of the Southern District of New York shall be served no later than 6 months after the filing of answers by the defendants. No other interrogatories shall be permitted except upon prior express permission of the Court.

      4.     Depositions of fact witnesses shall be completed no later than 7 months after the filing of answers by the defendants. Depositions of expert witnesses shall be completed no later than 9 months after the filing of answers by the defendants.

      a.     Unless stipulated by the parties or otherwise ordered by the Court, depositions shall not commence until all parties have responded to any first requests for production of documents.

      b.     Depositions shall proceed concurrently.

      c.     Without prior leave of the Court or stipulation of the parties, no deposition shall extend beyond one day of seven hours pursuant to Rule 30(d)(2) of the Federal Rules of Civil Procedure.

      5.     Plaintiffs' experts, if any, shall be designated no later than 6 months after the filing of answers by the defendants and plaintiffs' experts' reports shall

be served no later than 7 months after the filing of answers by the defendants.
Defendants' experts, if any, shall be designated no later than 7 months after the filing of
answers by the defendants and defendants' experts' reports shall be served no later than 8
months after the filing of answers by the defendants. Experts may be deposed, but such
depositions must occur within the time limit for all depositions set forth above.

        6.     Requests for admissions, if any, are to be served no later than 6
months after the filing of answers by the defendants.

        7.     All discovery, including expert discovery, is to be completed by 9
months after the filing of answers by the defendants. Interim deadlines for items 1-6
above may be extended by the parties on consent without application to the Court,
provided the parties are certain they can still meet the discovery completion date ordered
by the Court, which shall not be adjourned except upon a showing of extraordinary
circumstances.

        J.     Summary judgment motions, if any, shall be served no later than 11
months after the filing of answers by the defendants. Opposition papers shall be served
no later than 13 months after the filing of answers by the defendants. Reply papers shall
be served no later than 14 months after the filing of answers by the defendants. Counsel
shall arrange among themselves for one of them to file on that same date with the Clerk
of the Court a full set of motion papers of all parties (moving, opposition, and reply).
Oral argument on any summary judgment motions shall be held on _a date_
_to be fixed by the Court_

        K.     A final pretrial conference as to any remaining claims shall be held on
_a date to be fixed by the Court_, at which time the Court shall set a firm trial date. The timing and other
requirements for the Joint Pretrial Order and/or other pretrial submissions shall be
governed by the Court's Individual Rules of Practice.

        L.     The case is to be tried to a jury. The parties do not consent to trial before
the Magistrate Judge.

M.    All motions and applications shall be governed by Judge Brieant's Individual Rules of Practice. Counsel shall promptly familiarize themselves with all of the Court's Individual Rules, as well as the Local Rules for the United States District Court for the Southern District of New York.

SO ORDERED.

Charles L. Brieant
U.S.D.J.

DATED:    White Plains
New York, New York
April 25, 2002

P.10

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

JUL 1 0 2002

FILED
CLERK'S OFFICE

## BEFORE THE JUDICIAL PANEL
## ON MULTIDISTRICT LITIGATION

IN RE ENRON CORP.
SECURITIES, DERIVATIVE &
"ERISA" LITIGATION

MDL DOCKET NO. 1446

### CERTIFICATE OF SERVICE

I, Anthony C. Johnstone, hereby certify that on July 10, 2002, I caused true copies of the foregoing Motion to Vacate Conditional Transfer Orders CTO-1 and CTO-3, and the supporting brief, to be served by mail upon counsel for the parties listed on the attached Panel Service List.

DATED:    July 10, 2002

_____
Anthony C. Johnstone

**PANEL SERVICE LIST (Excerpted from CTO-3)**
**DOCKET NO. 1446**
**MDL-1446 -- IN RE ENRON CORP. SECURITIES, DERIVATIVE & "ERISA"**
**LITIGATION**

*Patricia O'Donoghue, et al. v. H. Eugene Lockhart, et al.,* S.D. New York, C.A. No. 7:02-2701
*Christophe J. Amon v. H. Eugene Lockhart, et al.,* S.D. New York, C.A. No. 7:02-2798
*Rosalyn M. Haratz v. H. Eugene Lockhart, et al.,* S.D. New York, C.A. No. 7:02-2829
*Paul E. Tag v. H. Eugene Lockhart, et al.,* S.D. New York, C.A. No. 7:02-3025

Jules Brody
Stull, Stull & Brody
6 East 45th Street
Suite 500
New York, NY 10017

Mark C. Grady
Abbey, Grady, LLP
212 East 39th Street
New Yor, NY 10016

Fred T. Isquith
Wolf, Haldenstein, Adler, Freeman &
Herz
270 Madison Avenue
New York, NY 10016

Laurence D. Paskowitz
Paskowitz & Associates
271 Madison Avenue
20th Floor
New York, NY 10016

Charles J. Piven
Law Offices of Charles J. Piven, P.A.
The World Trade Center-Baltimore
Suite 2525
401 East Pratt Street
Baltimore, MD 21202

Joseph H. Weiss
Weiss & Yourman
551 Fifth Avenue
New York, NY 10176

Elizabeth Baird
O'Melveny & Myers, LLP
555 13th Street, N.W.
Suite 500 W
Washington, DC 20004

Richard W. Clary
Cravath, Swaine & Moore
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019

James D. Baskin, III
Baskin Law Firm
919 Congress Avenue
Suite 1000
Austin, TX 78701

Steve W. Berman
Hagens Berman, LLP
1301 Fifth Avenue
Suite 2900
Seattle, WA 98101

Steven M. Bierman
Sidley Austin Brown & Wood, LLP
875 Third Avenue
New York, NY 10022

Thomas E. Bilek
Hoeffner & Bilek, LLP
440 Louisiana Street
Suite 720
Houston, TX 77002

John H. Boone
One Embarcadero Center
Suite 3940
San Francisco, CA 94111

Steven E. Cauley
Cauley, Geller, Bowman & Coates
P.O. Box 25438
Little Rock, AR 72221

Martin D. Chitwood
Chitwood & Harley
2900 Promenade II
1230 Peachtree Street, N.E.
Atlanta, GA 30309

James E. Coleman, Jr.
Carrington, Coleman, Sloman
& Blumenthal
200 Crescent Court
Suite 1500
Dallas, TX 75201

Joseph W. Cotchett
Cotchett, Pitre, Simon & McCarthy
San Francisco Airport Office Center
840 Malcolm Road, Suite 200
Burlingame, CA 94010

Tom Alan Cunningham
Cunningham Darlow Zook & Chapoton
1700 Chase Tower, 600 Travis
Houston, TX 77002

Mark Dearman
Dearman & Gerson
300 N.W. 82nd Avenue
Suite 110, Executive Pavilion
Plantation, FL 33324

Glen DeValerio
Berman DeValerio Pease Tabacco, et al.
One Liberty Square, 8th Floor
Boston, MA 02109

Richard B. Drubel
Boies, Schiller & Flexner, LLP
26 South Main Street
Hanover, NH 03755

Dynegy, Inc.
1000 Louisiana, Suite 5800
Houston, TX 77002

John G. Emerson, Jr.
Emerson Law Firm
P.O. Box 25336
Little Rock, AR 72221-5336

William B. Federman
Federman & Sherwood
120 North Robinson, Suite 2720
Oklahoma City, OK 73102

Richard M. Frankel
Hackerman Frankel & Manela
1122 Bissonnet
Houston, TX 77005

INVOLVED COUNSEL FOR SCHEDULE CTO-1 (Cont.) MDL 1446          PG. 2

Robin C. Gibbs
Gibbs & Bruns, L.L.P.
1100 Louisiana
Suite 5300
Houston, TX 77002

Mark K. Glasser
King & Spalding
1100 Louisiana
Suie 4000
Houston, TX 77002

H. Bruce Golden
Golden & Owens, LLP
1221 McKinney Street
Suite 3600
Houston, TX 77010

Roger B. Greenberg
Schwartz Junell Campbell & Oathout,
LLP
Two Houston Center
909 Fannin, Suite 2000
Houston, TX 77010

J. Clifford Gunter, III
Bracewell & Patterson
South Tower Pennzoil Place, Suite 2900
711 Louisiana Street
Houston, TX 77002

Robin L. Harrison
Campbell Harrison & Wright, LLP
4000 Two Houston Center
909 Fannin Street
Houston, TX 77010

G. Sean Jez
Fleming & Associates, L.L.P.
1330 Post Oak Blvd.
Suite 3030
Houston, TX 77056

Lynn W. Jinks, III
Jinks, Daniel, Crow & Seaborn L.L.C.
P.O. Box 350
Union Springs, AL 36089

Willem F. Jonckheer
Schubert & Reed, LLP
Two Embarcadero Center
Suite 1660
San Francisco, CA 94111

Sharon Katz
Davis, Polk & Wardwell
450 Lexington Avenue
New York, NY 10017

Jeffrey R. Krinsk
Finkelstein & Krinsk
501 West Broadway
Suite 1250
San Diego, CA 92101

William S. Lerach
Milberg, Weiss, Bershad, Hynes
& Lerach, LLP
401 B Street
Suite 1700
San Diego, CA 92101

Kenneth D. McConnico
830 Apollo Lane
Houston, TX 77058

Joseph A. McDermott, III
2929 Allen Parkway
Suite 2555
Houston, TX 77019

Jack E. McGehee
McGehee & Pianelli
1225 North Loop, W.
Suite 810
Houston, TX 77008

John J. McKetta, III
Graves, Dougherty, Hearon & Moody
515 Congress, Suite 2300
Austin, TX 78767

Frank W. Morgan
1776 Woodstead Court
Suite 228
The Woodlands, TX 77380

Karen L. Morris
Morris & Morris
1105 North Market Street
P.O. Box 2166
Wilmington, DE 19899

Raymond L. Niblock
324 N. College Avenue
P.O. Drawer 818
Fayetteville, AR 72702

Eric J.R. Nichols
Beck, Redden & Secrest
One Houston Center
Suite 4500
1221 McKinney Street
Houston, TX 77010

Jacks C. Nickens
Nickens, Lawless & Flack
1000 Louisiana
Suite 1800
Houston, TX 77002

Northern Trust Co.
c/o Robert J. Waters
505 South LaSalle Street
Chicago, IL 60605

Osprey Trust
c/o Wilmington Trust Company
Rodney Square North 1100
North Market Street
Wilmington, DE 19890

Charles R. Parker
Hill & Parker
5300 Memorial Drive
Suite 700
Houston, TX 77007

Ira M. Press
Kirby, McInerney & Squire, L.L.P.
830 Third Avenue
10th Floor
New York, NY 10022

William Kelly Puls
Puls Taylor & Woodson, LLP
2600 Airport Freeway
Fort Worth, TX 76111

Saul Roffe
Sirota & Sirota, LLP
110 Wall Street
21st Floor
New York, NY 10005

Thomas W. Sanky
Sanky & Luck, LLP
600 Travis Street
Suite 6200
Houston, TX 77002

INVOLVED COUNSEL FOR SCHEDULE CTO-1 (Cont.) MDL 1446     PG. 3

Lynn L. Sarko
Keller Rohrback, L.L.P.
1201 Third Avenue
Suite 3200
Seattle, WA 98101

David R. Scott
Scott & Scott, L.L.C.
108 Norwich Avenue
P.O. Box 192
Colchester, CT 06415

Thomas G. Shapiro
Shapiro, Haber & Urmy, LLP
75 State Street
Boston, MA 02109

Samuel P. Sporn
Schoengold & Sporn, P.C.
19 Fulton Street
Suite 406
New York, NY 10038

Stephen D. Susman
Susman Godfrey, L.L.P.
1000 Louisiana
Suite 5100
Houston, TX 77002

Paul Vizcarrondo, Jr.
Watchtell, Lipton, Rosen & Katz
51 West 52nd Street
New York, NY 10019

Keith A. Ward
Porter, Rogers, Dahlman & Gordon
Wells Fargo Bank Tower
400 West 15th Street
Suite 806
Austin, TX 78701-1647

Stewart M. Weltman
Stewart M. Weltman, P.C.
39 South LaSalle Street
Suite 308
Chicago, IL 60603

Robert C. Williams
1400 Smith Street
EB861
Houston, TX 77002

Zachary W.L. Wright
Tonkon Torp, LLP
1600 Pioneer Tower
888 Southwest 5th Avenue
Portland, OR 97204

Yosemite Securities Trust
c/o Wilmington Trust Company
Rodney Square North 1100
North Market Street
Delaware, DE 19890

Richard J. Zook
Cunningham Darlow Zook & Chapoton
1700 Chase Tower
600 Travis
Houston, TX 77002

## SUPPLEMENT TO PANEL SERVICE LIST
### (From CTO-1 Service List)

Jeffrey S. Abraham
Abraham & Paskowitz
One Penn Plaza
Suite 1910
New York, NY  10119

Robert J. Berg
Bernstein, Liebhard & Lifshitz, LLP
10 East 40th Street
22nd Floor
New York, NY  10016

Robert C. Finkel
Wolf Popper, LLP
845 Third Avenue
New York, NY  10022

Brian Murray
Rabin & Peckel LLP
275 Madison Avenue
34th Floor
New York, NY  10016